HIRSCHBERG, P. J., WOODWARD and HOOKER, JJ., concurred.

Assessment corrected in accordance with the opinion of JENKS, J., without costs. Settle order before JENKS, J.

---

FRANK G. WEST, Appellant, *v.* HENRY G. WOODRUFF, Respondent.

Third Department, March 7, 1906.

Negligence — when action is based on negligent management of horse, and not on the vicious character of the animal — complaint — allegations of defendant's knowledge of character of horse construed as charging negligence — on direction of verdict for defendant, evidence to be taken most favorably to plaintiff.

The plaintiff, who has been injured by the running away of the defendant's horse, which was compelled by the defendant to remain in the vicinity of trains of which it was afraid, may base his action upon the negligence of the defendant in compelling his horse to remain in such position and in negligently managing him, rather than upon the vicious nature of the animal.

An allegation that the defendant knew his horse to be nervous, high-spirited and unaccustomed to cars may be treated, not as a ground of recovery, but as stating a circumstance tending to show the negligence of the defendant.

In an action based on the negligence of the driver, and not upon his maintaining a vicious animal, the issue is: Did the defendant act as a prudent man in placing his horse in such position and keeping it there after it had become frightened by a train, when there was ample opportunity to get away from the exciting cause?

When a verdict is directed for the defendant, all disputed facts are to be taken as established in the plaintiff's favor, and he is entitled to the most favorable inference deducible from the evidence.

Evidence of defendant's negligence which entitled plaintiff to go to jury, considered.

APPEAL by the plaintiff, Frank G. West, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Livingston on the 8th day of May, 1905, upon the verdict of a jury rendered by direction of the court, and also from an order bearing date the 3d day of May, 1905, and entered in said clerk's office, denying the plaintiff's motion for a new trial made upon the minutes.

*Charles D. Newton* and *John G. Carpenter*, for the appellant.

*George D. Reed*, for the respondent.

KELLOGG, J.:

" In disposing of this case it is to be borne in mind that this is a directed verdict and the appellant is not only entitled to the most favorable inferences deducible from the evidence, but all the disputed facts are to be treated as established in her (his) favor." (*Koehler* v. *New York Steam Co.*, 183 N. Y. 1.)

It is not claimed that the plaintiff suffered his injury by reason of defendant's driving a vicious horse, as was claimed in *Benoit* v. *Troy & Lansingburgh R. R. Co.* (154 N. Y. 223), but the defendant is himself accused of personal negligence. The injury is alleged to have arisen not from the vice of the horse, but the negligence of the driver. The defendant himself, and not the horse, is, therefore, on trial.

The complaint alleges, in substance, among other things, that defendant, knowing his horse was nervous, high-spirited and unaccustomed to the cars, negligently drove it upon an embankment within a few feet of a moving train, and negligently attempted to

maintain it there while the train was passing, and that after he saw the horse was restless and frightened, and when it was rearing and plunging, he negligently managed the horse, did not attempt to get it away from the danger, but attempted to make it stand within a few feet of the engine, which was passing and blowing off steam and making a great noise, and that solely by reason of the negligence of the defendant, his wagon was overturned and the horse ran away and over the plaintiff and injured him. The animal was valuable, fifteen years old, gentle, of good life and had never run away before. The defendant had the right to drive it and he is without criticism for so doing. It is only claimed that knowing the place and the horse, and the dangers to be apprehended, he did not act as a prudent man would act under the circumstances. The character of the horse is alleged, not as a ground for recovery, but as one circumstance among others tending to show that the defendant was negligent. If he placed a known nervous, high-spirited horse in an unusual and strange place, where it would become frightened, and upon a narrow road on an embankment, a place where there would be difficulty in handling a frightened horse, all of those facts would be proper for consideration in determining whether he acted with due care, and if they do not indicate negligence in placing the horse there, they may well call upon him to exercise greater care in managing the horse than would be required under other circumstances, and would naturally bear upon the question whether when he saw it was frightened and nervous, prancing, dancing and shying, it was prudent to prevent it from moving on and forcing it to remain at the very spot where the exciting causes were. The care required to be exercised in any particular case depends upon all the circumstances making for safety or danger, and the dangers to be apprehended. There was evidence, considered most favorably to the plaintiff, tending to show that the plaintiff was injured by the negligence of the defendant, and that his injury was not caused by an inevitable, unforeseen accident for which there is no legal liability. At least the evidence was sufficient to require a submission to the jury of the question of the defendant's negligence.

Considered most favorably to the plaintiff, the evidence presents the following situation : At Avon the Erie railroad tracks run north and south on either side of the passenger depot, and are about four

rods from each other.   Just west of the westerly track is a bus plat-
form for the use of passengers coming to or going from the station by
conveyances, and there is a large open space there in Railroad avenue
suitable for the placing and accommodation of teams coming to the
station with or for passengers.   About thirty feet north of the bus
platform the milk road branches off from Railroad avenue and extends
along the track westerly for a distance and goes to the milk platform,
which is about one hundred and twenty feet north of the bus platform
and near the railroad track.   This road is not used for general
travel, but for teams drawing milk to the station.   The milk road
goes along on a level, but Railroad avenue descends, so that the milk
road at the milk platform is about four and one-half feet higher
than the street.   The defendant was well acquainted with the
locality, and knew the schedule time for the arrival and departure
of trains.   The Rochester train, the Buffalo train and another train
were due at the station at the same time, and were all nearly on
time.   Defendant came to the depot for a passenger expected to
arrive on the Buffalo train, and had been there about ten minutes
sitting in his buggy on the milk road at a place where it was about
twelve feet wide, extending from the westerly rail of the railroad;
the nearest wheel of his wagon and the horse were within about
six feet of said rail, and the milk road was here some four feet
higher than the street; and is described as and called an embank-
ment by some of the witnesses.   The horse was facing south.   At
the time the defendant drove up the horse was "acting nervous,
head up."   A few minutes before the accident the Rochester train
came from the south, on time, upon the track opposite the depot
and the defendant, and some seventy feet from him.   When the
train was some four or five rods away the horse seemed frightened
and would not stand, and was "prancing before the train pulled in and
when the train was pulling in; she never stopped."   The defendant
made no effort to drive away, although there was ample opportunity
and the Buffalo train was then due.   When the Buffalo train was
approaching from the north from behind his horse, and some two
or three hundred feet away from the horse, "she pricked up her
ears," the noise "scared" it, but defendant paid no attention to it.
When seventy-five or one hundred feet away the horse turned and
looked at the engine, which was blowing off steam.   When the

horse glanced around and "acted fierce," the defendant picked up the lines and spoke to it. It acted as if it "wanted to get out," stuck up its ears and began to dance, and it was not but a second or so before the engine was by its side, and it made a plunge and started quickly, and turned right around. It had a full swing to run right away from the engine if it had been allowed to go out. It turned around and turned the wagon bottom up. It kept shying off from the cars until it turned the wheel. It danced for about a minute before it tipped the defendant out, and while it danced and shied a little to the right apparently the wagon did not move. Defendant was holding it up. The horse began to dance and sheer to the west when the train was coming back of it. " She was getting up a little spirit and she began to put in considerable spirit when the train was about ten feet this side of the milk platform. She had turned her head at this time, and then she began to prance more; I called it shying; she wanted to get out of that, but she couldn't start because he held her; she was prancing and she had started to shy to the right; I should think she shied ten seconds before she got out of there; she did not shy very short on the start; she turned short about the time the engine passed." After the wagon tipped over the defendant fell down the embankment, and the horse ran away and ran over the plaintiff.

There is also evidence tending to show that the defendant knew as follows about the horse: It sometimes shied at unexpected things; when he drove within twenty or thirty feet of trains it was often quiet but sometimes frightened and many times made trouble; it was frequently nervous at the cars — on Railroad avenue when they were forty or fifty feet away; it was afraid of automobiles, especially if coming from behind; when meeting loads of furniture or baby carriages it was frightened and wanted to go faster, but was controlled; defendant swears it first commenced to shy at loads of washing machines about three years ago; it was frightened at traction engines, but defendant could drive around one if the road was good and wide; defendant had met threshing machines, but if they stopped he could go by; it never attempted to bolt or run, it would simply go to one side; once it got excited with him between a shed and the cars but he had no trouble in controlling it; it does not appear that she was used to the milk road or the nearness of the trains

passing there; it does not appear that she was ever so near a moving train before, or, nearer than about twenty feet; when defendant held her within ten feet of a train she made "a good deal of fuss."

When the horse was frightened at the Rochester train there was ample opportunity for the defendant to get into a better place, but he compelled it to remain there, knowing that another train was coming from behind him. When it was frightened at the Buffalo train he could easily have passed ahead of the train to a safe place if he had permitted the horse to move along as it was disposed to do, but he chose to compel the frightened animal to remain there, and sought purposely to overcome it, perhaps to accustom it to the situation. He may have been more intent upon holding it there, subduing and educating it, than he was for the safety of the public or of the plaintiff, whose position on the road and physical infirmities he well knew.

Did the defendant act as a prudent man in placing this horse in that place and in keeping it there after it became frightened at the Rochester train, and also at the Buffalo train, when he had ample opportunity to get away from the exciting cause? These are questions to be answered by the inferences practical men would draw from the whole situation, and should be passed upon in the first instance by a jury. The judgment and order are reversed and a new trial granted, with costs to appellant to abide the event.

All concurred.

Judgment and order reversed and new trial granted, with costs to appellant to abide event.

---

Marcus M. Knowles, Respondent, *v*. The Board of Supervisors of the County of Chemung and Others, Defendants, Impleaded with The Town of Ashland and Merton Baldwin, as Supervisor of the Town of Ashland, Appellants.

Third Department, March 7, 1906.

County — supervisors may aid town to bear expense of building bridges although the town has issued bonds to pay therefor.

A board of supervisors of a county, pursuant to the power conferred by section 63 of the County Law, has power to appropriate county moneys not exceeding